Victor BONO et al., Plaintiffs,

v.

William SAXBE et al., Defendants.

Civ. No. 74–81–E.

United States District Court, E. D. Illinois.

April 19, 1978.

G. Flint Taylor, Jr., Michael E. Deutsch, Ralph Hurvitz, Chicago, Ill., Arpiar Saunders, Concord, N. H., Harvey M. Grossman, Carbondale, Ill., Lee H. Tockman, Howard Eglit, Chicago, Ill., for plaintiffs.

U. S. Atty., represented by Frederick J. Hess, Asst. U. S. Atty., East St. Louis, Ill., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

This matter is before the Court following a bench trial. Post trial briefs have been submitted and closing argument waived.

The case is a class action, pursuant to Fed.R.Civ.P. 23(b)(2).[1] The class is composed of all inmates currently confined in the Marion Penitentiary Control Unit and all who will be so confined in the future. Jurisdiction is predicated upon 28 U.S.C. § 1331(a).

The Court hereby makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The United States Penitentiary at Marion, Illinois (hereinafter referred to as Marion) is classified as a maximum security

---

1. In addition, the following cases pending in this Court were consolidated with this case: CV74–167E; CV74–169E; CV75–208E; CV73–193E; CV74–260E.

institution maintained by the Federal Bureau of Prisons and is designed to hold 525 prisoners.

2. Defendant, Griffin Bell, is the Attorney General of the United States and pursuant to 18 U.S.C. § 4001 is charged with the management and control of all federal penal and correctional institutions.

3. Defendant, Norman Carlson, is the Director of the Federal Bureau of Prisons and is charged pursuant to 18 U.S.C. § 4041 and 28 C.F.R. Subpart Q with the responsibility of administering the federal prisons.

4. Ralph Aaron was the Warden of Marion and in that capacity was charged with the responsibility of administering the entire institution, including the Control Unit.

5. George Wilkinson is the Warden of Marion and in that capacity is charged with the responsibility of administering the entire institution including the Control Unit.

6. Harold Miller is an Associate Warden at Marion and in this capacity is responsible for the general supervision of the Control Unit.

7. Rayford Johnson was an Associate Warden at Marion and in that capacity was responsible for the general supervision of the Control Unit. He was also an advisor of the Institution Discipline Committee.

8. The Control Unit Manager was Ralph Whitehouse, who had the responsibility for the care, custody and control of H–Unit under the supervision of the administrative staff members of Marion.

9. Edward Posey is the Acting Control Unit Manager, who has the responsibility for the care, custody and control of the unit under the supervision of the administrative staff members of Marion.

10. Maurice Sigler is the Chairman of the U.S. Board of Parole, and is charged with the responsibility and control of the board.

11. Marion is divided in nine (9) housing units labeled A through I.

12. I–Unit is the housing area utilized for short-term segregation at Marion.

13. H–Unit is the housing area utilized for long-term control at Marion and it is referred to as the Control Unit.

14. A through F–Units are currently utilized to house the general population of Marion.

15. H–Unit is divided into four ranges, labeled A, B, C, and D, each of which range contains 18 single person cells.

16. Each cell in the Control Unit measures approximately 6'6" by 8' by 8'6" (high), has three concrete walls and a steel bar front and is equipped with the following fixtures:

(a) one steel bunk;

(b) a stainless steel commode and sink combination;

(c) one light fixture containing a 40 or 60 watt light bulb.

17. On A and D Range and on ten cells in B–Range in the Control Unit, there exists a wall constructed of plexiglass and steel which is placed approximately three feet in front of the cell. A window is constructed in this wall and may be closed or opened at the discretion of the prisoner or a correctional officer. The decision of a correctional officer overrides that of a prisoner in the event of a dispute.

18. The last ten (10) cells of B Range in the Control Unit, hereinafter referred to as B–Range closed front cells, are equipped with a steel front door (with window) which is kept closed as a disciplinary measure or at the prisoner's request.

19. There are no mirrors in Control Unit cells. Control Unit prisoners are restricted on the amount of personal property they may have in their cell. See Marion Policy Statement MI–7300.80A dated 5/30/75, p. 2, Appendix.

20. Control Unit prisoners, unless confined in B–Range closed front cells, are allowed to utilize personally owned radios provided that earphones are utilized. These radios must be battery operated since cells in the Control Unit do not have electrical outlets.

21. A prisoner placed in closed front B–Range for disciplinary reasons has only le-

gal material and some religious material. However, prisoners who have requested a cell for study or those who were placed there as a result of construction on A–Range have been permitted to retain their personal property.

22. Control Unit prisoners are handcuffed at all times when they leave their cells for any purpose other than showering or recreation.

23. Control Unit prisoners confined in B–Range closed front cells are handcuffed at all times when they leave their cells. For the purpose of recreation and showers they are uncuffed in their secured recreation area and shower area.

24. Prisoners not employed in the C–Range industry program in the Control Unit are generally confined in their cells for an average of 23 hours and 20 minutes per day.

25. Although the menu in the Control Unit is the same as that offered to the prisoners in general population, second helpings are not available.

26. The quantity of food provided each prisoner is the same. It is served from a hot cart located outside of D–Range in the Control Unit and placed on individual trays, six of which are placed on an unheated serving cart and wheeled to the prisoner in his cell by a correctional officer.

27. Prisoners in the Control Unit are not allowed to attend educational classes. They are allowed to take correspondence courses of their choice in their cell. Marion pays one-half of the cost of correspondence courses for prisoners without funds or who have no veterans benefits. Doodle art supplies are also furnished by the institution. Vocational training opportunities available to prisoners in the Control Unit include correspondence courses and the C–Range industry.

28. Except on C–Range, there is no television in the Control Unit to allow educational or recreational viewing.

29. Prisoners in the Control Unit are not allowed in the institution library. Control Unit prisoners are allowed to select books they wish from a library cart.

30. No group religious services are permitted in the Control Unit. No group gatherings are allowed in the unit except for multiple recreation.

31. A work opportunity is maintained on C–Range within the Control Unit which consists of four punch press machines used in the manufacture of fasteners for U.S. Mail Bags. The machines are enclosed with individual mesh cells. Two additional mesh cells are work areas and have been added for assembly purposes. Participation in the C–Range industry is a favorable factor considered by the Control Unit Committee in evaluating a prisoner's conduct while in the Control Unit.

32. Generally, two Control Unit prisoners are permitted to recreate simultaneously, however, a prisoner recreates alone because he wishes to or the staff feels he should recreate alone.

33. Prisoners in the Control Unit receive commissary items from a restricted commissary list once every two (2) weeks.

34. Group activities are not permitted in the Control Unit, except for multiple recreation.

35. Prisoners are received in the Control Unit from three (3) sources: The Marion general population; another Federal or State Prison; or by direct designation following conviction.

36. Special Progress Reports contain summaries of log entries which consist of observations and conclusions made by Correctional Officers of the day-to-day activities and behavior of unit prisoners be it positive or negative.

37. In making the determination whether a prisoner should remain in the Control Unit, Warden Aaron placed substantial weight on the reservations and recommendations of the Control Unit Committee and the Special Progress Reports. This determination is currently made in accordance with Marion Policy Statement MI–7300.-80A.

38. As of January, 1975, prisoners confined in the Control Unit are informed in

writing whether their incarceration therein will be for a term of three (3), six (6), nine (9) months or indefinite. As of February 28, 1975, of the forty-nine (49) inmates in the Control Unit, four (4) had a three month term, eight (8) had a six month term, three (3) had a nine month term, and thirty-four (34) had an indefinite term. All prisoners were informed that their projected release would be conditional upon obtaining a "satisfactory" monthly rating for the prescribed term. As of June 11, 1975, of the thirty-eight (38) inmates housed in the Control Unit, two (2) had three month terms, six (6) had six month terms, nine (9) had nine month terms, and twenty-one (21) had indefinite terms.

39. The three (3) categories of prisoners who are currently placed in the Control Unit are enumerated on Page 2 of MI–7300.80A, under Subpart 5 titled "Assignment to a Control Unit."

40. Prisoners in the Control Unit are required to conduct all visits, except attorney visits, in a control visiting room in which the prisoner and visitor are separated by a plexiglass wall through which they may see each other and speak by means of telephone.

41. The Control Unit prisoners are strip searched before and after all visits excepting attorneys' visits.

42. Visitors' handbags are checked for contraband prior to visiting in the control visiting room and population visiting room.

43. If a Control Unit prisoner and his visitor wish to exchange documents in the control visiting room, the prisoner or visitor must give the document to the officer assigned to the visiting room. This officer then carries the document from the presenter's side of the glass to the recipient's side of the glass, which requires him to be out of the view of both. The document, if not prohibited, is then given to the visitor or prisoner in the control visiting room.

44. There have been no instances of contraband being found in the Control Unit which had come from outside the institution since January 1, 1974.

45. During all visits in the Control Unit visiting room, a Correctional Officer is stationed inside of the population visiting room and is in position to observe the parties meeting therein.

46. Marion Policy Statement 73300.80 dated June 7, 1973, is superseded by MI–7300.80A, dated May 30, 1975.

47. All visitors are required to walk through a metal detector prior to entering the control visiting room and population visiting room when the machine is in operation.

48. If confined in an area where the lighting is poor, some people may tend to feel depressed.

49. If any prisoner in the Control Unit is evaluated by Dr. Robert Carr as having a mental disease, he would recommend that the individual be immediately treated at Marion by the medical department at Marion and the individual's case referred to the Springfield Medical Center for observation, diagnosis, and indicated treatment.

50. Doctor Kenneth Bowles' recommendations that prisoners be sent to Springfield Medical Center were not always immediately followed. For example, Dr. Bowles' recommendation that Merle Chaussee, a Control Unit prisoner, be transferred to Springfield was not accomplished for six months. Transfer to Springfield is restricted from time to time for want of bedspace.

51. Some of the behavior of prisoners in the Control Unit, or a penitentiary, can be attributed to the conditions of their confinement and the frustrations each individual perceives as a result of confinement in the Control Unit or a penitentiary.

52. No psychological evaluation is done immediately prior to or subsequent to a term of confinement in the Control Unit. Rather, individual evaluations are made while the individual is in the unit.

53. A physician's assistant makes daily rounds in the Control Unit by walking through the unit and checking and administering to the needs of those prisoners who are awake or of those to whom he has been directed by the doctors and correctional staff.

54. No medical check-up is done on prisoners prior to or upon assignment to the Control Unit, unless the individual has requested one or has not had an earlier federal physical.

55. A Control Unit prisoner in a hospital cell is not let out of his room except for emergency examinations or diagnosis. A prisoner in general population who is in the hospital has his door open from 6:00 A.M. through 10:30 P.M. depending upon his condition and availability of supervisory personnel.

56. Prisoners who have no money in their commissary accounts do not receive a monthly stipend from the Bureau of Prisons.

57. The cells contain 52 square feet of floor space. The activities which take place in the cell are reading, writing, eating, sleeping, and possibly listening to a radio. Communication in the Control Unit is restricted due to the use of partitions of steel and glass which separate most cells.

58. Prisoners are released from their cells for approximately 30 minutes a day for exercise recreation on a locked tier, sometimes with one other person. Recreation outside in the fresh air occurs approximately one hour per month. These limited periods are the only opportunity for social interaction between prisoners. Correctional officers and other staff are seldom on the tiers and very seldom speak to prisoners.

59. Idleness pervades the Control Unit. Most prisoners have nothing to do. The impact of confinement on Control Unit prisoners' mental and physical health can be harmful, debilitating and dehumanizing.

60. Prisoners who are incarcerated in the Control Unit remain there a minimum of three months. Most prisoners remain in the Control Unit for a year or longer and do not know how long they will remain or what they must do to be released.

61. Vocational and educational services and programs provided to prisoners in the Control Unit are limited. A limited work opportunity is available to prisoners on C Range. All other prisoners are denied any vocational activity. Educational opportunities other than G.E.D. certification are available only for those prisoners who can afford to purchase correspondence courses.

62. Commissary privileges are available to Control Unit prisoners periodically, but the privilege is limited as to selection, quantity and dollar amount. Prisoners who do not have money cannot receive commissary. Other than C Range, no opportunity exists for earning money. Prisoners receive no stipend from the institution.

63. The menu is varied, balanced and nutritious. The food prepared in the institution dining room is the same for staff and inmates alike. It is served warm from hot carts. At times, however, food has become cold or cold lunches are served.

64. Commissary privileges are provided for those who can afford them. For those who have no money, hygiene items, tobacco, and reading material are provided.

65. The stated purpose of the control unit is as a preventive measure and not as punishment [MI–7300.80A, dated 5/30/75, pages A, C, F(4)]. In individual instances classification to the control unit has been used as a punishment.

66. The only way in which a person's behavior can be predicted is on the basis of his past behavior under similar conditions. Although predictions are possible, they are difficult to make and may be erroneous.

## CONCLUSIONS OF LAW

Plaintiffs raise five legal issues in support of their claims. Briefly stated, these issues are as follows. First, whether classification of an inmate to the control unit is violative of substantive due process? Second, whether commitment to the control unit, without a finding of a specific disciplinary offense, violates the Eighth Amendment's prohibition against cruel and unusual punishment? Third, whether current procedures for classification to the control unit violates procedural due process? Fourth, whether conditions of confinement within the control unit, and specifically the "boxcars", violates the Eighth Amendment?

Fifth and finally, whether the policy of requiring inmates, who are confined in the control unit, to conduct social visits via the enclosed glass partitions, and by use of a telephone, violates the Eighth Amendment.[2] As stated, these issues are not self-contained. There is a considerable overlap, as would be expected in a case of this complexity. Nevertheless, as much as is possible, the Court will treat these issues *seriatim*.

## I. SUBSTANTIVE DUE PROCESS

■ It is well settled that the Due Process Clause provides substantive as well as procedural protections against arbitrary government action. *See, e. g., Moore v. East Cleveland*, 431 U.S. 494; 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), and the discussion contained therein. Substantive due process protects individuals from government action so arbitrary as to violate protected interests. This limitation on the government is imposed, when appropriate, regardless of the particular procedural safeguards which may have been implemented along with a regulatory scheme. In addition, this limitation applies to agency actions as well as to legislative actions. *See, e. g., Rasulis v. Weinberger*, 502 F.2d 1006 (7th Cir. 1974).

By its very terms, however, the Due Process Clause protects only certain interests. Thus, the initial inquiry is to determine whether the plaintiffs' interest in remaining in the general population at Marion, rather than being assigned to the control unit, is protected by the clause.

In *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Supreme Court rejected the contention that any change in the conditions of confinement having an adverse impact on a prisoner involved the protection of the Due Process Clause. In that case, the Court held that a state prisoner had no protected liberty interest in remaining at one state institution rather than another. Thus, an intra-system transfer did not require a hearing. The Court did recognize, however, that a liberty interest could arise by virtue of state law.

■ In this case, there is no inherent liberty interest sufficient to invoke the protections of the Due Process Clause. The plaintiffs have been validly convicted and thus their inherent liberty interests have been extensively curtailed. *See, Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Nevertheless, a protected liberty interest is created in the defendants' policies themselves. Marion Policy Statement MI–7300.80A, dated May 30, 1975 (and its predecessor, MI–7300.80, dated June 7, 1973), states that placement in the Control Unit is based on an inmate's demonstrated inability to adjust to an open institutional setting. The inmates are led to expect that, so long as their behavior conforms to a mandated norm, they will remain in the general population. It is only upon some proof of nonconformity which will result in their placement in the control unit. The Court finds that this expectation, rooted in defendants' own policy statements, gives rise to a protected liberty interest.[3] *See, Walker v. Hughes*, 558 F.2d 1247 (6th Cir. 1977).

■ Having found a protected liberty interest, the next step is to determine the standard for review of the challenged ac-

---

**2.** These issues, although paraphrased, are essentially as stated by plaintiffs' counsel at trial. In their post trial memorandum plaintiffs have organized, and even characterized, these issues slightly differently. The Court, however, finds that the issues, as stated in the text, more conveniently lend themselves to an organized treatment, and thus will discuss them within that framework.

**3.** This result is not inconsistent with *Meachum, supra*. This Court has previously relied on

*Meachum* to hold that a federal prisoner may be transferred from one federal institution to another without an adverse effect on a protected liberty interest, *McDonnell v. United States Attorney General*, 420 F.Supp. 217 (1976). In that case Bureau of Prison Regulations were analyzed with the conclusion that they created no right to a hearing before a transfer. In this case, however, a finding that the regulations give rise to a protected interest adequately distinguishes *Meachum*.

tion. Where fundamental liberty interests are involved, government action must further a compelling state interest to withstand judicial scrutiny. *See, e. g., Moore v. East Cleveland, supra; Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). When protected interests which do not rise to the level of fundamental rights are involved, however, the government need only show a rational basis for its actions. *See, e. g., Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934).[4]

■ In this case, the latter test is applicable. The plaintiffs' fundamental liberty interest has been extinguished by virtue of their criminal convictions. The liberty interest at stake here is that of remaining in general population within the Marion prison. This interest is not entitled to the same protections as those interests emanating directly or implicitly from the Bill of Rights. Thus, there need be only a rational basis for any infringement on this interest.[5]

■ The policy statement on the control unit states the purpose of the control unit. That purpose is "to remove proven and demonstrated behavior problems from the general population so that others may pursue their own program of work or self-improvement without fear of harm from these disruptive offenders." The critical question—whether this purpose justifies the removal of certain individuals from general population, must be answered in the affirmative. The loss to the individual is clearly outweighed by the stated purpose of the control unit, and quite clearly passes the rational basis test.

■ The Court also holds that incarceration in the control unit need not be subject to a time limitation. The purpose of the control unit is to prevent violence and chaos before it occurs. Such prevention would be meaningless if prison officials' discretion was subjected to time limitations. The Court, however, does recognize that the absence of any time limitations is potentially dangerous. The Court believes that the constitutional requirements, set out in the section on procedural due process, adequately protect against potential abuses in this open-ended arrangement.[6]

While the general purpose of the control unit passes constitutional matter, as applied there are constitutional infirmities. These infirmities exist both as regards to the substantive criteria used to implement the control unit program and also as those criteria are applied to individuals.

Persons are assigned to the control unit because of the crime for which they are incarcerated, their prior conduct within the prison setting, or as protective custody cases. In making these general determinations, the following individual factors are also taken into account:

1. The nature of the offense which resulted in the offender's confinement.
2. Incidents in which the offender has caused injury to fellow inmates during confinement.
3. Incidents in which the offender has caused injury to government employees during confinement.
4. Incidents in which the offender has expressed threats to the life or well being of fellow inmates or staff members.

4. These tests, while explicitly and succinctly stated in equal protection cases [e. g., *San Antonia Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1974)], are recognized only implicitly in Supreme Court substantive due process cases. In dissent in *Moore v. East Cleveland, supra,* Mr. Justice White explicitly acknowledges that these are the tests to be gleaned from the Court's prior pronouncements.

5. Plaintiffs argue that the compelling state interest test is proper since a protected interest is involved. According to them, any protected

interest is entitled to this stricter scrutiny. This argument fails to recognize the numerous cases which have applied the rational basis test. Acceptance of this argument would be to totally disregard the rational basis test.

6. In *Adams v. Carlson,* 488 F.2d 619 (7th Cir. 1973), the Court discussed indefinite punitive segregation. In refusing to find such a scheme *per se* unconstitutional, the Court noted that so long as periodic review attended by procedural safeguards, was provided, an indefinite "sentencing" scheme could continue.

5. Escape attempts by the offender.
6. Incidents involving possession of deadly weapons by an offender.
7. Incidents involving possession of escape tools or plans by an offender.
8. Incidents involving possession of dangerous drugs.
9. Incidents involving a disruption of the orderly operation of a prison, jail, or other correctional institution.

■ At the trial, all evidence indicated that no reasonable prediction of an inmate's behavior in the prison could be based on the crime for which he was convicted. Accordingly, the Court finds that any attempts to determine that an inmate will not function in the prison setting, based on the crime for which he was convicted, are violative of due process.

The second method by which prison officials decide that a person should be placed in the control unit is through a review of an inmate's institutional performance. The evidence indicated that this is a reasonable device. Thus, it passes constitutional muster, along with specific factors 2, 3, 4, 6, and 9.

■ Factors 5 and 7 concern escape. There was evidence that most of the inmates at Marion were serving long sentences and are potential escape risks. In fact, Marion itself is meant to be the most secure of all federal institutions. It is designed specifically to prevent escapes. Thus, every inmate is a potential candidate for the control unit. While procedural safeguards should prevent abuse of these categories, the Court is also unable to determine any nexus between these categories and the removal of behavior problems from the general population. Since there is evidence showing these factors to be unreasonable, and no evidence supporting them, the Court has to conclude that their use is violative of due process.

No particular showing was made regarding factor 8, therefore it cannot be deemed unreasonable.

Factor 9 is a catch-all category. It is extremely broad and most individual abuses have occurred under its aegis. Nevertheless, an inmate may create a powderkeg situation within the institution and still not fall within another recognized category. Thus, there is a need by prison officials for such a broad factor. Surely the accomplished instigator of riots is as dangerous to the prison community as the accomplished welder of a homemade knife. While procedural safeguards should protect against abuses of this factor, the past abuses of it merit comment.

■ In several instances, this criterion has been used to silence prison critics. It has been used to silence religious leaders. It has been used to silence economical and philosophical dissidents. And it has been used when no other rationale was available to justify incarceration in the control unit. Often no showing was made as to how these persons disrupted the orderly running of the institution. Accordingly, if this general category is to be used, specific notice and reasons for the action are required. The reasons must be sufficiently detailed to support the conclusion that the safety of the institution is threatened in some way other than those listed in the other acceptable factors.

■ Finally, the Court finds that certain individuals were assigned to the control unit as punishment for specific acts. Bureau of Prison policy specifically dictates that these violations of prison rules are to be dealt with through the inmate discipline procedures. Insofar as those procedures are bypassed, and the defendants make use of the control unit as punishment, defendants are in violation of their own rules.

To correct these abuses, defendants are given ten (10) days within which to submit a list of the names of all persons currently confined in the control unit and the reasons for their confinement. Immediately thereafter, new hearings, in accordance with the procedural safeguards mandated *infra,* are to be conducted. Those persons found to be unnecessarily confined in the control unit are to be released.

The remaining basis for confinement in the control unit—protection of an individual—is not properly before the Court. As far as the Court can determine, these individuals are assigned to administrative segregation. It does not appear that any such person was ever, or will be, involuntarily assigned to the control unit for this reason. Thus, it is unnecessary for the Court to consider it.

## II. EIGHTH AMENDMENT—NO CURRENT DISCIPLINARY OFFENSE

[11] The second issue articulated by trial counsel is whether confinement in the control unit without a finding of a current specific offense violates the prohibition against cruel and unusual punishment. This argument is based on the holdings that, even within a prison setting, punishment may be entirely disproportionate to the offense, and thus violate the Eighth Amendment. *See, Adams v. Carlson,* 488 F.2d 619 (7th Cir. 1973). Plaintiffs correctly reason that punishment for no offense is disproportionate and cruel and unusual.

■ While recognizing this rule of law, the Court finds it inapplicable to the facts before it. The use of the control unit is definitely viewed as a punitive measure by the plaintiffs. The defendants view.it as an administrative type segregation. The Court, however, finds that neither of these characterizations is completely accurate. While use of the control unit is usually precipitated by some act, punishable at least internally, its intended purpose is not punitive, per se, for the act. Rather, the purpose is to prevent future disruptions within the institution. On the other hand, the evidence indicates that, in certain individual instances, use of the control unit has been as a punitive, rather than a preventive, measure. Accordingly, when used punitively, the Court has already found that there is a violation of substantive due process. When used as a preventive measure,

there will have been no finding of a specific disciplinary offense. But incarceration therein will not be punitive per se, therefore no Eighth Amendment violation results.[7]

## III. PROCEDURAL DUE PROCESS

■ The Court has previously found a protected liberty interest involved in this case. As such, procedural safeguards are required. The Court finds that the proper safeguards begin with those enunciated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). As *Wolff* itself recognized, however, these procedures are flexible. Accordingly, the Court will discuss in detail each particular procedural protection and its minimal acceptable application. The Court also will discuss the additional safeguards it deems constitutionally necessary.

### A. Written Notice of the Claimed Acts

■ This *Wolff* requirement is necessarily altered by the nature of the particular proceeding. The Court finds that, in this context, the inmate must be given written notice of the acts, or series of acts, which have led prison officials to contemplate taking the preventive measure of confinement in the control unit. This notice must be specific enough to allow the inmate to understand the proposed action. For example, if the inmate is being considered for placement in the control unit because of his previous assaultive conduct within the prison system, the notice should specify the prior assaultive incidents. If several prior acts constitute the charges, these all should be specifically identified.

### B. Witnesses and Documentary Evidence

The inmates, in addition to a personal hearing, should be permitted to present documentation evidence in their behalf, and, in the discretion of prison officials, call wit-

---

7. This reasoning presupposes that specific charges will be made and proven which would warrant placement in the control unit. Oftentimes, these same charges will have resulted in punitive disciplinary action, while their cumulative effect merits placement in the control unit.

nesses in their behalf. In short, the inmate is constitutionally permitted to explain why he is able to function within the prison population without posing a threat to the other inmates or staff.

## C. Confrontation

There need be no confrontation of witnesses, although the inmate is entitled to be informed of the evidence against him when doing so will not endanger anyone.

## D. Impartial Decision Maker

Not only is the inmate entitled to an impartial decision maker, he is also entitled to a decision maker qualified to determine whether the extreme measure of removing a person from population is justified. This decision involves much more than a simple weighing of facts. It involves professional expertise. The defendants are hereby ordered, and plaintiffs permitted, to submit a proposal to implement this requirement.

## E. Written Reasons

If the decision is made to classify an inmate for the control unit, detailed reasons for the action are required. The Court emphasizes that reasons are required in part to facilitate later review, both administrative and judicial. To serve this function the reasons cannot be merely boilerplate. Detailed reasons facilitate later review, help prevent arbitrary decisions, and provide the affected individual with a rationale for the decision.

## F. Review

An inmate is classified to the control unit because there has been a determination that his continued presence within the prison population presents a danger to the health and well-being of others. When assigned to the control unit, the inmate's status has drastically changed. To insure fairness and protect against mistakes, the Court finds that some review of the initial decision is necessary. The review must be sufficiently near in time to the decision to protect against an erroneous decision without undue curtailment of the inmate's privileges. Defendants are ordered, and plaintiffs permitted, to submit proposals on this issue.

## G. Periodic Review

Some form of periodic review is required to insure that continuing incarceration in the control unit is required. The Court recognizes the difficulty involved. Initially, an inmate is placed in the control unit because his past conduct within the general population has enabled prison officials to predict that his continued incarceration therein imposes a threat to the health and well-being of staff and fellow inmates. Once confined to the control unit, an inmate is unable to demonstrate his ability to function again in the general population. Thus, there is a real danger that, once confined to the control unit, an inmate could remain there indefinitely. To protect against such a result, some form of periodic review is required. The defendants are ordered, and plaintiffs permitted, to file with this Court suggested procedures for accomplishing meaningful review to determine when releases to population is warranted.[8]

## H. Procedures for Release from Control Unit

At trial, two of plaintiff's biggest objections to the control unit were the lack of a time limitation on confinement therein and a lack of information available to the inmates to inform them what they could do to expedite their release. The Court has previously ruled that, since the control unit is a preventive and not a punitive device, no specific time limits can be imposed. Nevertheless, the Court finds that the inmates should be informed of what affirmative actions they may take to expedite their release from the control unit. Defendants are required, and plaintiffs permitted, to submit proposals through which they may comply with this procedural safeguard.

---

**8.** The Court has been advised that defendants currently are reviewing periodically the status of those confined in the control unit.

In conclusion, the Court finds that the foregoing are the minimal procedural safeguards required. Defendants are free, of course, to provide greater safeguards than those mandated above.

The Court also emphasizes that the procedures just described are not coextensive with those to be followed when dealing with inmate discipline. Thus, an inmate accused of assault will be given a *Wolff* type hearing. Upon a finding of guilt he will be appropriately punished. Thereafter, the defendants may determine that the inmate is too dangerous to remain in the open population, and initiate proceedings to place him in the control unit. At this stage the above described procedures are mandated.

## IV. CONDITIONS OF CONFINEMENT IN THE CONTROL UNIT AS CRUEL AND UNUSUAL PUNISHMENT

Plaintiffs have attacked conditions of confinement within the control unit as amounting to cruel and unusual punishment. This attack is multi-faceted and focuses both on certain individual aspects of the control unit as well as the cumulative effect of such conditions.

No simple, concise legal definition of the prohibition against cruel and unusual punishment has been offered by the courts. Instead, the courts have recognized that evolving standards of decency that mark the progress of a maturing society must be taken into account, *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Within this general framework, various tests have been enumerated—"conditions 'so foul, so inhuman, and so violative of basic concepts of decency'," *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971); and whether the punishment offends "broad and idealistic concepts of dignity, civilized standards, humanity and decency." *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968).

The numerous courts dealing with this issue uniformly have focused on the particular facts before them and measured these facts against a standard evolved from current norms of society. Thus, most forms of corporal punishment have been rejected. *See, Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974), and discussion therein. Similarly, when prison conditions have so deteriorated as to be unfit for human habitation, a violation of the Eighth Amendment has been found. *See, e. g., Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974).

In this case, neither of these two factual situations are present. There is no pattern of corporal punishment,[9] nor are the inmates deprived of the basic necessities of life. There is, however, a different type of punishment imposed. Plaintiffs' uncontroverted evidence showed the debilitating mental effect on those inmates confined to the control unit. They were locked up in a closed-front cell 23½ hours per day. Little, if no, activity was offered to relieve this boredom. Reading material, while available, was limited. Access to legal materials was limited. Outside physical exercise was sporadic, at best, and indoor exercise limited. Meaningful contact with other persons was virtually nonexistent. Rehabilitative programs were virtually nonexistent.

The most odious characteristic, however, was the closed-front cell, the boxcar. An inmate would spend nearly every minute of every day in his cell, cut off from any contact with the outside world—even the limited "outside world" of the incarcerated felon. The inmates' existence was limited by the space of his cell and the approximately three feet beyond the cell bars, at which point the outer wall was erected. These walls contained but a small window in the door. Even though the inmate could express a preference as to whether the outer door would be open or closed, the correctional officer had the final say in the matter.[10]

---

9. Although isolated instances were alluded to during trial.

10. The Court recently visited the control unit to re-acquaint itself with the physical structure. When standing inside a cell, with the outer door closed, visibility was extremely limited. With the bars of the cell several feet from the closed front of the cell, only a narrow angle of sight was permitted through the window of the outside wall.

The sensory deprivations occasioned by use of the boxcars, along with the lack of any idea about what could be done to be released from the control unit, resulted in both mental and physical deterioration. Simultaneously, unnecessary pain and suffering was the result. Finally, no justification for the use of the boxcars was even offered at trial.

■ Modern technological advances are capable of rendering medieval tortures such as the rack and screw obsolete. The potential for psychological and physiological torture is boundless—thus, the emerging role of the Eighth Amendment in our society. A society which takes pride in its commitment to the preservation of human rights must be ever vigilant to protect those rights. It cannot countenance any infringements on those rights which could create inroads into our ordered sense of decency. Accordingly, on the record before it, the Court finds that use of the closed front cells, the boxcars, violates society's standards of humanity and dignity, and results in the infliction of unnecessary pain and suffering. Thus, it is violative of the Eighth Amendment's prohibition against cruel and unusual punishment. The continued, nonconsensual use of a closed front cell is immediately enjoined. In addition, defendants are required, and plaintiffs permitted, to submit proposals to allow increased physical exercise, especially outside exercise, for those confined in the control unit.

■ Plaintiffs also seek expanded educational and rehabilitative programs. The presence or absence of these programs is not constitutionally mandated, *Moody v. Daggett*, 429 U.S. 78, fn. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). Therefore, no opinion is given on this issue.

## V. VISITATION

■ Plaintiffs contend that visitation through glassed-in partitions, where there is no opportunity for physical contact, and where speaking must be by means of a telephone, constitutes cruel and unusual punishment. Plaintiffs argue that visitation is a fundamental right and that the defendants must show a compelling state interest to justify an infringement on that right. The Court disagrees.

The most obvious right forfeited by a convicted felon is the right of freedom of association. *See, Jones v. North Carolina Prisoners Union, Inc., supra.* Visiting procedure matters are within the scope of prison discipline and security, and as such are subject to the broad discretion of prison officials. *McCray v. Sullivan*, 509 F.2d 1332 (5th Cir. 1975) *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86. See also, *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

■ In this case, prison officials have restricted visitation, ostensibly to control the introduction of contraband into the institution. In making this determination, they are to be afforded wide latitude. The means are reasonably designed to meet the ends. The Court cannot state that such visitation procedures are so inhuman as to constitute cruel and unusual punishment. Accordingly, this claim is rejected.

For the foregoing reasons, the Court hereby enters the following order:

1. Defendants are enjoined from confining an inmate in the Control Unit solely because of the nature of the crime which resulted in his incarceration, for escape attempts, or incidents involving possession of escape tools or plans. If confined in the Control Unit for conduct which disrupts the orderly running of the institution, the inmate must be given detailed notice as to the specific conduct referred to.

2. Within ten (10) days defendants shall conduct a review of all inmates currently confined within the Control Unit. Those confined therein for any reason enumerated in the preceding paragraph are to be immediately released. Defendants may not confine any inmate in the Control Unit unless the inmate is given a hearing in conformance with this memorandum opinion as it relates to procedural due process.

3. The defendants are enjoined from placement of an inmate in the Control Unit without conducting a hearing. The hearing shall include the following safeguards:

A. Written notice of the acts which allegedly warrant placement in the Control Unit;

B. A personal hearing on those charges, including the right to present witnesses in ones behalf unless doing so would jeopardize institutional security, in which case written statements would be permitted.

C. Impartial decision maker with sufficient expertise to make the decision whether placement in the Control Unit is warranted. Defendants shall submit a proposal to effectuate this provision.

D. Reasons for the action taken.

E. Review of the initial decision. Defendants shall submit a proposal to implement this provision.

F. Periodic review of the status of inmates in the Control Unit. Defendants shall submit a proposal implementing this provision.

4. Defendants shall provide guidelines which an inmate can follow to expedite his release from the Control Unit.

5. The nonconsensual placement in a "boxcar" type cell is enjoined. Defendants are given seven (7) days to remove all persons currently confined in such a cell to a different cell.

6. Defendants shall submit a proposal providing for increased physical exercise for inmates confined in the Control Unit.

7. Within thirty (30) days, defendants shall submit to this Court a status report of their compliance with this order. At this time they also shall submit their proposals relating to implementation of this order requiring impartial, qualified decision makers, review of the initial decision, periodic review of the status of Control Unit inmates, and increased physical exercise.