**Albert GARZA, Plaintiff-Appellant,**

v.

**Harold G. MILLER, Warden, Defendant-Appellee.**

**No. 81–2681.**

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1982.

Decided Sept. 10, 1982.

---

8. *See State Farm Fire and Casualty Co. v. McGlawn*, 84 Ill.App.3d 107, 39 Ill.Dec. 531, 404 N.E.2d 1122 (1980).

Edna S. Epstein, Sidley & Austin, Chicago, Ill., for plaintiff-appellant.

Richard H. Lloyd, Asst. U. S. Atty., James R. Burgess, Jr., U. S. Atty., East St. Louis, Ill., for defendant-appellee.

Before PELL and BAUER, Circuit Judges, and DECKER,* Senior District Judge.

PELL, Circuit Judge.

In this originally *pro se* action [1] under 28 U.S.C. § 1331(a) (1976), the appellant Albert Garza claims that a purported "lockdown" in effect at the Marion, Illinois, federal penitentiary (Marion) violates his due process and equal protection rights. He also claims that his security level classification is arbitrary and capricious and that he was denied equal protection when his request to transfer to another prison was denied. Garza seeks declaratory and injunctive relief to require the Warden of Marion to provide him with prison industry employment and living conditions equivalent to those prior to the "lockdown." Alternatively, Garza seeks transfer from Mar-

ion to another federal facility. After a hearing before a federal magistrate, the magistrate in an oral opinion found against Garza on all issues. This appeal followed.

## I. Factual Background

In February of 1979, Marion was designated as a level six institution in the Federal Bureau of Prisons system. Level six is the highest security classification in the prison system, and Marion is the only prison in the system with a level six classification. There was testimony during the hearings before the magistrate that Marion is the institution to which inmates that are prone either to violence or escape are committed.

Each inmate in the federal prison system is given a security designation and a custody designation. The security designation is predicated on factors such as the nature of the offense committed and prior offenses. The custody designation is an evaluation of a prisoner's behavior in custody, including escape attempts and violence. Inmate placement within the prison system is determined by an inmate's overall security classification, which includes both the security and custody evaluations. A request to be transferred to another prison by Garza was denied by the Federal Bureau of Prisons because its Executive Review Panel concluded that he still "required the security offered only at Marion." Garza's security classification is level six. There was testimony that thirty to forty percent of the inmates at the time of the strike were transferred to other facilities, and that some of these inmates had level six classifications.

On September 15, 1980, the inmates at Marion staged a work strike. It was the third such strike that year. Also within the prior eighteen months, two inmates had been murdered and an associate warden had been stabbed, although no correlation with the work strike was established. On September 15, Garza was confined in the "H-

---

* Bernard M. Decker, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. On appeal the appellant is represented by counsel.

Unit," a maximum security unit, of the penitentiary due to an escape attempt in 1979 and an assault upon a sheriff during the escape for which he was convicted of assault. It is uncontested that Garza did not participate in the work strike and was at all times willing to work. On September 17, 1980, Garza was released into the general population of the prison.

In response to the September 15 work strike and prior incidents of violence, security precautions within the prison were intensified. Prior to the strike, there had been approximately 100 to 115 inmates employed in the prison's industries programs. After the strike there were three work calls, but an insufficient number of inmates reported to work to keep the institution industry program functioning at its past capacity. There were still, however, jobs available as barbers and orderlies within each unit of the prison.

To strengthen security after the work strike, the prison began to be operated on a cellhouse basis. For recreation prior to September 15, the inmates had access to either the main yard outside or the inside recreation area, containing a track, card tables, pool tables, ping-pong tables, and weight-lifting area, for approximately twelve hours a day. Team sports were also arranged within the prison population as a whole and with outside groups. After September 15, one cellhouse at a time was given access to the recreational facilities, with the result that each prisoner had access to either the main yard or inside recreation area for twelve hours a week. Team sports are arranged only between inmates within the same cellhouse. Each week a two-hour movie is also provided as well as two hours of hobbycrafts. When not using this recreational time, an inmate is confined to the "range" outside his cell. The range is the walkway approximately ten feet wide by one hundred feet long in each individual cellhouse, which contains card tables and televisions.

As to the remaining living conditions prior to September 15, the law library was open to inmates from 8 in the morning until 9 in the evening on weekdays and 8 until 3:30 p.m. on Saturdays and Sundays. An adult education program and high school equivalency program were available, as well as college classes in the prison. After the work strike, each inmate had access to the library for ten hours a week at specified times during the week. Special approval for additional time due to involvement in litigation could be obtained by filing a request slip. Library books could be checked out by an inmate overnight. Garza's own requests for additional time had been on occasion granted and at other times denied. Garza indicated to the magistrate that he had been represented by counsel in two of his five pending cases, and that none of his cases had been dismissed for untimely filings. The in-prison college courses were replaced by correspondence courses.

Garza, a member of the Jewish faith, raised objections concerning the availability of Jewish services and programs. Both before and after the strike, no rabbi made regular visits or performed services because there were no such requests from the Jewish inmates and there were too few Jewish inmates to constitute a minyan.[2] Similarly, no Jewish religious holidays were observed due to the absence of requests. Visits from a Jewish layman are available upon request and Kosher meals are provided.

An associate warden testified before the magistrate that, although the increased security at Marion was initiated in response to the September 15 work strike and prior incidents of violence, its continuation was predicated on the demonstrated inclination of Marion's population toward violence and escape attempts, combined with a lack of cooperation on the part of prisoners with the prison staff which we assume in part refers to the disinclination of the prisoners to return to work.

---

**2.** A minyan is the quorum necessary for public worship, consisting of not less than ten males above the age of thirteen.

## II. The Magistrate's Opinion

On October 13 and 14, 1981, by agreement of the parties, a bench trial of Garza's complaint was conducted by a magistrate for the District Court for the Southern District of Illinois. In his oral opinion, the magistrate concluded:

So basically, what it comes down to is that number one, the institution is not on a lockdown status, and inmates are not being locked in their cells. Number two, there have been certain restrictions placed on inmates at Marion Penitentiary which were not imposed prior to September 1980. There is no showing that the actions of the institution constitute cruel and unusual punishment. There is no showing of any protected liberty or property interest over which due process requirements should have been applied, and there has been no showing that the institution acted arbitrarily or capriciously toward the inmates. I think the evidence has been that it was based on a series of events that justified their actions. So after I reach that conclusion, I have no alternative but to render judgment for the defendant and against the plaintiff.

The magistrate rejected Garza's contention that 18 U.S.C. § 4122(b) (1976) created a statutory entitlement to prison industry jobs for all physically fit inmates in the federal prison system. He also found that there was an absence of evidence from which to conclude that the respondent had acted arbitrarily or capriciously in its security classification of Garza and its denial of his request for a transfer.

## III. Constitutional and Statutory Claims

Generally Garza challenges the individual security measures installed at Marion on September 15 and their continuation as a whole as a denial of his due process and equal protection rights. The individual measures to which Garza objects are: (1) the general unavailability of jobs within the prison; (2) an alleged failure to provide Jewish religious services and programs; (3) restrictions on recreation; (4) changes in the availability of educational programs; and (5) limits on access to the law library. This opinion will address the validity of each of these security precautions individually and the constitutionality of their continuation as a whole after the end of the strike. It is also necessary to examine Garza's claim that his security classification was erroneous and his equal protection claim based on the denial of his transfer request.

### A. Decreased Availability of Prison Jobs, Recreation, and Educational Programs

Garza's claim that the prison officials violated his rights by limiting jobs within the prison has both a statutory and constitutional basis. For his statutory claim of entitlement to a job, Garza relies upon the first clause of 18 U.S.C. § 4122(b) (1976): "Its [the Federal Prison Industries'] board of directors shall provide employment for all physically fit inmates in the United States penal and correctional institutions . . . ." [3] Garza asserts that this provision grants all physically fit inmates in federal prisons a statutory right to employment in federal prison industries. Concomitantly, he argues that this statutory right creates a property or liberty interest in employment triggering the substantive and procedural protections of the Fifth Amendment. The respondent, however, has countered that section 4122(b) is qualified by 18 U.S.C. § 4122(a) (1976), which provides that the operation of prison industries is fully within the discretion of the Federal Prison Industries Board:

Federal Prison Industries shall determine in what manner and to what extent industrial operations shall be carried on in Federal penal and correctional institutions for the production of commodities for consumption in such institutions or for sale to the departments or agencies of the United States, but not for sale to the public in competition with private enterprise.

---

**3.** Section 4123 of 18 U.S.C., upon which Garza also relies, is addressed only to the establish- ment of new industries.

The only reported decision to address whether section 4122 provides a right to prison employment concludes without analysis that, so long as the Federal Prison Industries and its board of directors do not administer the authority conferred by section 4122 in an arbitrary or capricious manner, the courts may not interfere with their performance of their delegated functions. *Mercer v. United States Medical Center for Federal Prisoners*, 312 F.Supp. 1077, 1079 (W.D.Mo.1970). The *Mercer* court based its perception of its review function on general principles of administrative law rather than on any constitutional or statutory basis. *Id.*

■ We do not construe section 4122(b) as conferring a statutory right to prison industry employment on all physically fit inmates. Section 4122(a) clearly vests discretion in the Federal Prison Industries to determine in what manner and to what extent industrial operations shall be carried on in the federal prisons. Section 4122(b) merely outlines factors in the exercise of that discretion by its board of directors in its distribution of jobs. When the board is determining in what manner and to what extent industrial employment shall be made available within a prison under section 4122(b), it must take into consideration the factors in section 4122(b). Yet section 4122(b) does not mandate that every physically fit inmate be given a job when the board had determined in its discretion based upon the equally valid considerations that a more limited number of jobs should be made available within the prison or the system as a whole. Any other construction of section 4122(b) would render nugatory the clear delegation of discretion to the board under section 4122(a).

The legislative history of section 4122(b) supports our conclusion that Congress had no intention of creating a substantive right to employment for all physically fit inmates. Section 744a of the 1940 edition of the United States Code was the first codification of the statutory forerunner of section 4122(b). Section 744a reads as follows:

It shall be the duty of the Attorney General to provide employment for all physically fit inmates in the United States penal and correctional institutions *in such diversified forms as will reduce to a minimum competition with private industry or free labor.*

18 U.S.C. § 744a (1940)(emphasis added). This section, and the provision of the enactment upon which it was based, Act of May 27, 1930, ch. 340 § 1, 46 Stat. 391 (1930), imposed only a duty to provide employment in such diversified form as to minimize competition with private industry and free labor. There was no unqualified duty to provide employment to all physically fit inmates. When the Criminal Code was revised in 1948, this section 744a was consolidated with part of section 744k of the 1940 edition to form section 4122(b) in its current form. The consolidated part of section 744k also dealt with diversification of prison industries and provided the second clause of what is now section 4122(b). When these two sections were consolidated in 1948 with only "such changes of phraseology as were necessary to effect the consolidation," *see* the Reviser's Notes to 18 U.S.C. § 4122(b)(1976), the qualification on the board's duty to provide employment in section 744a was omitted. Apparently, therefore, there was never any intent on the part of Congress to create a duty to provide employment for all physically fit inmates. Section 4122(b) in its present form represents nothing more than an inartful consolidation of former sections 744a and 744k.

■ Nor does Garza have a property or liberty interest in prison employment, or increased recreation and educational courses. This court, in the context of a Fourteenth Amendment prisoner suit, recently clarified the dimensions of property and liberty interests subject to due process procedural safeguards. *Shango v. Jurich*, 681 F.2d 1091 (7th Cir. 1982). Existence of a cognizable liberty or property interest is also necessary to trigger the requirements of substantive due process. *Jefferies v. Turkey Run Consolidated School District*, 492 F.2d 1 (7th Cir. 1974). In *Shango*, we stated that liberty interests may originate in the Constitution or be

created by state statutes or duly promulgated prison regulations. *Shango v. Jurich*, at 1097, 1099–1100. However, every official pronouncement of prison officials does not create a protectible right. *Id.* at 1099.

■■ This court has previously held that there is no constitutional mandate to provide educational, rehabilitative, or vocational programs, in the absence of conditions that rise to a violation of the Eighth Amendment. *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir. 1981); *Bono v. Saxbe*, 450 F.Supp. 934, 947 (E.D.Ill.1978), *aff'd in part and remanded in part*, 620 F.2d 609 (7th Cir. 1980). Applying *Shango*, we also find that Garza had no protectible liberty or property interest in prison employment by virtue of section 4122(b). The statutory provisions of section 4122 vest discretion in the Federal Prison Industries' board of directors to determine the extent to which prison employment shall be provided. The exercise of such discretion " 'preclude[s] the implication of a liberty interest deserving of due process protection.' " *Shango v. Jurich*, at 1100 (quoting *Anthony v. Wilkinson*, 637 F.2d 1130, 1141 (7th Cir. 1980), *vacated on other grounds mem. sub nom., Hawaii v. Mererios*, 453 U.S. 902, 101 S.Ct. 3135, 69 L.Ed.2d 989 (1981)). Any expectation that Garza might have had of keeping his prison job does not amount to a property or liberty interest. *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir. 1980). "Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement to invoke due process." *Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976).[4]

■ The appellant has failed to demonstrate either that the decision to install increased security measures at Marion was an arbitrary decision or some form of invidious discrimination. Security was increased after the last of three work strikes and after several incidents of violence. Increased security necessitated the limitations on recreation and educational programs, and lack of inmate interest curtailed the number of available jobs. These events were clearly adequate to justify the changes within Marion's operations.

### B. Right to Religious Services and Programs

Garza, as noted above, is a member of the Jewish faith. The evidence at the hearing established that no rabbi visited Marion, no Jewish services were conducted, and no Jewish holidays observed. However, these conditions had existed prior to the work strike, and were the result of an absence of requests for these requisites of the Jewish faith and the unavailability of a minyan necessary to conduct Jewish services. The testimony of the prison chaplain was to the effect that every effort would have been made to accommodate any requests.

■ As the Supreme Court stated in clarifying the responsibility of prison officials to provide prisoners with the opportunity to exercise their religious beliefs:

We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

*Cruz v. Beto*, 405 U.S. 319, 322 n.2, 92 S.Ct. 1079, 1081 n.2, 31 L.Ed.2d 263 (1972). The record does not in any sense indicate that

---

4. The appellant also argues that the decrease in prison jobs adversely affects his opportunity to earn good time credits. Every state action carrying adverse consequences for prison inmates does not automatically activate a due process right, as *Moody v. Daggett, supra*, points out. To establish a protectible due process interest, Garza had to demonstrate a substantive restriction on the officials' discretion, *Shango v. Jurich*, at 1100, and this he has simply failed to do.

the Marion prison officials have denied Garza a reasonable opportunity to practice his religion. Given the small number of Jewish inmates and the security level of the prison, it was certainly within the officials' discretion to provide a rabbi, services, and other requisites of the Jewish faith only upon request. The absence of religious programs and observances is attributable to the lack of requests, not to any affirmative refusals by the prison officials to provide them.

## C. Right to Access to the Courts

■ Prisoners have a due process constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). This right of access requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with reasonable access to adequate law libraries or adequate assistance from persons trained in the law. *Id.* at 818, 97 S.Ct. at 1493.

■ Garza objects to the time limitations the prison has placed on his access to the law library and his inability to confer with inmates outside his unit. He does not object to the adequacy of the law library nor does he contend that he has not been provided with the constitutional alternative of adequate assistance from persons trained in the law. Indeed, the record demonstrates that Garza has been ably represented in this case and others and has never had any suit dismissed due to untimely filings. This evidence fails to demonstrate a constitutional violation. *See, e.g., United States v. Garza*, 664 F.2d 135, 142 (7th Cir. 1981); *Lock v. Jenkins*, 641 F.2d 488, 498 (7th Cir. 1981). Whatever right Garza might have had to confer with other inmates in the absence of alternative forms of legal assistance, *see Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), that right is not implicated on the facts of this complaint.

## D. Continuation of Increased Security after the Work Strike

■ Garza has failed to demonstrate that he has any constitutional right which was infringed by imposition of the increased security measures in Marion. There has been no allegation, nor reasonably could there have been, that the conditions at the prison constitute wanton and unnecessary infliction of pain or are grossly disproportionate to the severity of the crime warranting punishment, so as to give rise to an Eighth Amendment violation. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). Our review of decisions of prison officials to continue previously imposed security measures has been limited to cases in which continuation of the measures entails continued imposition upon a constitutional right. *See, e.g., Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978); *La Batt v. Twomey*, 513 F.2d 641 (7th Cir. 1975).

Continuation of the security measures in Marion after the work strike was predicated on Marion's security classification and the propensity of Marion's population toward violence and escape. Although thirty to forty percent of Marion's population has been transferred since the work strike, there is no indication in the record that Marion's security classification and the inmates ordinarily confined in the institution do not now warrant the security precautions taken by the officials. Our judicial function is not to "second-guess" the decisions of the prison administration. Such decisions require expertise and comprehensive planning which counsels deference by the federal courts to these discretionary decisions by the appropriate prison authorities. "[C]ourts . . . cannot assume that . . . prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens." *Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981).

## E. Garza's Security Classification and Denied Transfer

■ Garza's remaining objections may be addressed briefly. There was no

evidence in the record to substantiate Garza's own conclusory allegation expressed only in the hearing that his security classification was erroneous or arbitrary. The record did demonstrate that he had been involved in an escape attempt and was convicted of assault on an officer in connection with that attempt. As to the denial of his transfer request, the Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility. 18 U.S.C. § 4082 (1976). Such decisions are entirely within the discretion of prison authorities. *See Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). Garza failed to demonstrate that the prison officials had purposely and intentionally discriminated against him in determining his security classification or denying his request for transfer to another prison. *Shango v. Jurich*, at 1104. Such a showing was necessary to establish a violation of equal protection. *Id.* The only evidence in the record as to the basis of the denial was that the prison officials had determined that Garza, a level six prisoner, still required the security provided only in Marion, and in the circumstances of this case that was sufficient.

For these reasons, therefore, the judgment under review is

AFFIRMED.