Victor BONO et al., Plaintiffs,

v.

William E. SAXBE et al., Defendants.

Civ. No. 74–81–E.

United States District Court,
S. D. Illinois.

Jan. 16, 1981.
On Motion for Reconsideration—
Sept. 30, 1981.

James R. Burgess, Jr., U. S. Atty., S. D. Ill., E. St. Louis, Ill., for defendants.

New Hampshire Legal Assistance, Concord, N. H., Howard Eglit, American Civil Liberties Union, Chicago, Ill., Dennis Cunningham and Michael Deutsch, Chicago, Ill., David Johnson, Land of Lincoln Legal Assistance, Marion Prisoners' Rights Project, Carbondale, Ill., for plaintiffs.

## ORDER

FOREMAN, Chief Judge:

Before the Court is plaintiffs' Motion for Rule to Show Cause why defendants should not be held in contempt for allegedly violating this Court's order in *Bono v. Saxbe*, 450 F.Supp. 934 (E.D.Ill.1978) and 462 F.Supp. 146 (E.D.Ill.1978). This motion concerns defendants' use of a particular kind of cell in the Control Unit (H-Unit) at the United States Penitentiary at Marion, Illinois. H-Unit is divided into four ranges, labeled A, B, C and D, each of which contains eighteen (18) single inmate cells. As set forth in the order recorded at 450 F.Supp. 934, 937 (E.D. Ill.1978), each cell has three walls and a steel bar front. On A and D Range, and on ten cells of B Range, numbers 9 through 18, there exists a wall constructed of steel and plexiglass approximately three feet beyond the steel bars. The side walls of the cell come forward to meet this outer wall. On April 19, 1978, when the original *Bono* order was handed down, the outer walls of A and D Range cells contained one large plexiglass window in the stationary portion of the wall, and a door containing two plexiglass windows with a steel bar grill recessed three feet from the outer wall. (See photo, Exhibit 5, appended.) The outer walls of cells number 9 through 18 on B Range contained one small plexiglass window and the steel door of the outer wall had two small windows about eye level. (See photo, Exhibit 1, appended.) These cells on B Range, numbers 9 through 18, were given the term "boxcars" since, standing inside one when the outer door of which had been closed, a person could liken the experience to standing inside a closed freight car.[1]

The Court, in its April 19, 1978 order, enjoined the "nonconsensual placement" of an inmate in a "boxcar" type cell. 450 F.Supp. at 948 (Number 5). In discussing the boxcar cells, this Court stated:

> The most odious characteristic, however, was the closed-front cell, the boxcar. An inmate would spend nearly every minute of every day in his cell, cut off from any contact with the outside world—even the limited "outside world" of the incarcerated felon. The inmate's existence was limited by the space of his cell and the approximately three feet beyond the cell bars, at which point the outer wall was erected. These walls contained but a small window in the door. Even though the inmate could express a preference as to whether the outer door would be open or closed, the correctional officer had the final say in the matter.
>
> The sensory deprivation occasioned by use of the boxcars, along with the lack of any idea about what could be done to be released from the control unit, resulted in both mental and physical deterioration. Simultaneously, unnecessary pain and suffering was the result. Finally, no justification for the use of the boxcars was even offered at trial.
>
> Modern technological advances are capable of rendering medieval tortures such as the rack and screw obsolete. The potential for psychological and physiological torture is boundless—thus, the emerging role of the Eighth Amendment in our

---

1. The Court recently visited the control unit to re-acquaint itself with the physical structure. When standing inside a cell, with the outer door closed, visibility was extremely limited. With the bars of the cell several feet from the closed front of the cell, only a narrow angle of sight was permitted through the window of the outside wall.

society. A society which takes pride in its commitment to the preservation of human rights must be ever vigilant to protect those rights. It cannot countenance any infringement on those rights which could create inroads into our ordered sense of decency. Accordingly, on the record before it, the Court finds that use of the closed front cells, the boxcars, violates society's standards of humanity and dignity, and results in the infliction of unnecessary pain and suffering. Thus, it is violative of the Eighth Amendment's prohibition against cruel and unusual punishment. The continued, nonconsensual use of a closed front cell is immediately enjoined.

450 F.Supp. at 946-47. In the order, the word "boxcar" was never specifically defined. Looking in retrospect, plaintiffs construed the word "boxcar" to mean every cell on A and D Range and cells 9 through 18 on B Range, that is, every cell with a steel and plexiglass outer wall and door. The defendants on the other hand read the opinion to enjoin only the use of cells on B Range, numbers 9 through 18.

For clarification of the intent of the Court's order of April 19, 1978, 450 F.Supp. 934, wherein at page 948 at paragraph 5, the Court ordered "the nonconsensual placement in a 'boxcar' type cell is enjoined," the intended meaning of this was to apply to all closed front cells, whether on A, B or D Range.

In order to avoid further possible confusion and because of the modification of the cells on B Range to make them substantially similar to the cells on A and D Range, the Court will in the future refrain from the use of the term "boxcar" and instead use the term "closed front cell."

### CONTEMPT AND CLOSED FRONT CELLS

The specific matter before this Court is the issue of whether defendants are in contempt for their alleged violation of this Court's order in *Bono v. Saxbe, supra,* in view of defendants' present use of closed front cells on B Range in cells number 9 through 18. In the interest of establishing a final and an authoritative rule of law on the constitutionality under the Eighth Amendment of defendants' use of the closed front cells on B Range, the Court will consider that issue in passing on the contempt issue.

Crucial to the contempt matter is defendants' logic in determining that their resumed nonconsensual use of the closed front cells number 9 through 18 on B Range complied with the order of this Court. In order to deal with the mandate of *Bono,* the Bureau of Prisons undertook a $4,800 reconstruction of the outer walls and doors of cells 9 through 18 on B Range. Their efforts resulted in two large windows in the door. (See photo, Exhibit 8, appended.)

Defendants then began to use these closed front cells on B Range again, but the use was limited to disciplinary segregation within H-Unit. As a rule, the outer door was to remain open, but could be closed in the H-Unit manager's discretion for "administrative" reasons. For example, the outer doors of all those cells on B Range would be closed when an inmate was moved on or off the range. In addition, the throwing of food, water or human waste out onto the range would occasion closing the outer door of the cells. The duration of the closing in this second situation lay within the H-Unit manager's discretion.

Defendants apparently reasoned that the increased light available by the enlargement of the plexiglass windows in the door of the closed front cells on B Range (See photo, Exhibit 8, appended), along with the new procedure whereby the outer door was closed only for administrative reasons, leapt all constitutional hurdles preventing nonconsensual closure of the outer doors of those cells.

In time, plaintiffs filed their Motion for a Rule to Show Cause why a contempt citation should not issue. Relying on this Court's order of April 19, 1978, and testimony of inmates that when the outer door is closed, ventilation in the cells is minimal and efforts to communicate with staff go virtually without notice, plaintiffs argue

that the contempt of Marion officials for the order of this Court is a foregone conclusion. Defendants, on the other hand, assert that *Bono* applied only to cells 9 through 18 on B Range in the Control Unit; that the refurbished cell door fronts have eliminated the sensory deprivation of the boxcars; that the decision to close the outer door is administrative only and not punitive; and that the decision to close the outer door is within the informed discretion of the prison officials and is sufficiently safeguarded to prevent abuse by those officials.

## FINDINGS OF FACT

With the above arguments in mind, the Court makes the following findings of fact:

1. On the cells in A and D Range and cells 9 through 18 of B Range, there exists a door constructed of plexiglass and steel, which is placed three feet in front of the bars of the cell and which may be locked.

2. Sometime after this Court's order of April 1978, cells 9 through 18 on B Range underwent reconstruction costing approximately $4,800, the object of which was to make the windows of the doors of the B Range cells let in substantially as much light as the windows of A and D Range cells.

3. Cells of B Range, numbers 9 through 18, are currently used as disciplinary segregation for H-Unit inmates found guilty by The Institution Disciplinary Committee (IDC) of violating prison regulations.

4. Prior to a finding by the IDC, an inmate is given traditional procedural safeguards of an Incident Report outlining the charges, notice of the hearing, opportunity to have staff representation, opportunity to present witnesses and the opportunity to be present.

5. Only the IDC can place an inmate in cells 9 through 18 on B Range, and the IDC placement is for a fixed number of days.

6. While in H-Unit disciplinary segregation, the inmate is given first a 7-day and then successive 30-day reviews by the IDC to determine whether continued placement is necessary.

7. While in H-Unit disciplinary segregation, a limit is placed on the personal property an inmate may possess. The limits are identical to those placed on disciplinary segregation inmates in the general population at U.S.P. Marion. Inmates have no television or radios, but may possess their legal materials, as well as limited numbers of books, magazines and newspapers.

8. Inmates in H-Unit disciplinary segregation are allowed the same shower, recreation and telephone privileges as other H-Unit inmates. A physician's assistant, an educational counselor, food service personnel and other prison staff make daily visits to H-Unit disciplinary segregation.

9. Each of the ten (10) cells of B Range, cells 9 through 18, have self-contained ventilation systems which consist of intake and outtake air vents within the cell itself.

10. Inmate witnesses testified that when the outer door is closed, ventilation in the closed front cells is restricted.

11. The doors are made of steel and plexiglass constructed in front of the cells in H-Unit disciplinary segregation and are as a general rule, left open and unlocked giving an inmate control over it.

12. The crucial matter for decision is when can the doors be closed? Presently, there are two circumstances when the steel and plexiglass doors in front of the H-Unit disciplinary segregation cells 9 through 18 on B Range will be closed. The first is during periods of movement of inmates and staff on the range and then only for a matter of minutes. The second, and perhaps more critical, is when the Control Unit Manager exercises his discretion to close the outer door because the conduct of the inmate, in the manager's judgment, poses a threat to the security and safety of the inmates and staff.

13. Examples of situations of the second type are throwing of food, food trays, trash, feces, urine or personal property out of the cell and onto the range, or flooding of the cell and range.

14. The decision to close and lock the outside door on cells 9 through 18 on B

Range for behavior reasons is one made by the Control Unit Manager and continues until such time as that inmate's behavior shows that the door can be opened without a safety threat being present. The Control Unit Manager testified that an inmate is personally advised either orally or in writing, of the reasons for locking the door and under what circumstances it will be unlocked. Since placement there is for emergency or unusual disruptive conduct this is generally done after the door is locked. No formal hearing procedure is utilized.

15. Under present circumstances, a door may be locked anywhere from a matter of minutes to days. In at least one instance, the door was locked for thirty-five days. The discretion to reopen the door lies with the Control Unit Manager, after, in his opinion, the reason for locking the door in the first instance has been removed.

16. An administrative decision to lock the outside door does not affect the shower or recreation privileges of the inmate. If an inmate's behavior is so severe that even letting him out of his cell for recreation and showers poses a threat, the IDC can curtail these privileges. This, however, is not a decision which can be administratively made by the Control Unit Manager.

17. Water pressure and/or service to H-Unit disciplinary segregation cells may be and has been curtailed when an inmate engages in flooding of his cell or the range. In such situations, water is provided at meals for short periods of time and at other limited intervals. Water is restored when flooding ceases.

18. When the outer door is locked, there is a curtailment of the inmate's visual sense, but the curtailment is not as severe as before the B Range cell outer doors and walls were reconstructed. There is a severe curtailment of hearing and communication.

## CONCLUSIONS OF LAW

Plaintiff's Petition for a Rule to Show Cause attacks primarily the resumed use of the H-Unit disciplinary segregation cells, that is, closed front cells number 9 through 18 on B Range, whereby the outer door can be closed by administrative order of the H-Unit Manager. For the reasons detailed below, defendants are not to be adjudged in contempt of this Court's order and the petition must fail. However, consistent with the original *Bono v. Saxbe* order, the parties will be required to submit proposals for operation of certain aspects of the use of the B Range cells in question which will be reviewed by this Court, subsequent to which the Court will issue a final ruling on the use of those cells in H-Unit.

### A. DISCIPLINARY SEGREGATION

■ Insofar as cells 9 through 18 on B Range are used for purposes of disciplinary segregation, defendants are in compliance with both the Eighth and Fifth Amendments. Evidence showed that a need existed for disciplinary segregation in H-Unit because of a total lack of alternate sanctions for H-Unit inmates found guilty by the IDC of violating institution rules. In the general population of the prison, disciplinary segregation in I-Unit was available. In H-Unit, no such sanction was available. Thus, there is a rational basis for the use of the cells in question as a means to encourage compliance with institutional rules, in light of the fact that the requisite procedural safeguards are provided. *See, Adams v. Carlson*, 375 F.Supp. 375 (E.D.Ill.1974). However, this holding is not intended to allow correction officials to reinstitute the conditions enjoined in *Bono*. While the defendants may use the cells for disciplinary segregation, their discretion to close the outer doors must be limited to certain circumstances, as explained below.

### B. CLOSING THE OUTER DOOR

■ As previously stated, the crucial issue in this proceeding is whether defendants are in compliance with the *Bono* order at the times when the outer door is closed. Under the present practice at the prison, the outer door is closed when (a) a guard escorts an inmate on or off the range; and (b) when inmates throw things from their cells, such as personal property, food, garbage, urine or feces which pose a safety or

health hazard to correction staff and other inmates. A closing of the outer door in these instances is characterized as administrative by defendants and is undertaken only for safety and security reasons.

First, the Court is of the opinion that the Eighth Amendment is not violated by defendants' closing of the outer doors of cells 9 through 18 on B Range, for the safety of staff and other inmates, when an inmate is taken on or off the range or when a staff member must come onto the range for some other legitimate purpose for a short period of time. An essential element of the prohibition of *Bono* lay in the fact that the outer door was kept closed as a general rule for long periods of time and that the inmate had no idea as to why he was placed there or how his release from the cell would be effected. In contrast, a closing of the outer door for a brief period cannot be expected to have the effects which the Court found abhorrent in *Bono*. The inmate understands the reasons for a brief closing of the outer door for movement of inmates and staff on the range and is aware that it will be reopened within minutes. Thus, the potential for detrimental psychological and physical harm from prolonged enclosure in the cell is eliminated. Moreover, a valid justification has been advanced—the safety of inmates and staff alike. Things thrown from the cells at persons passing by can obviously injure. Where the evil proscribed by *Bono* is eliminated so thoroughly, the prohibition of *Bono* necessarily is withdrawn.

Closing the outer door for purposes other than movement of inmates and staff presents different concerns. In this situation, the inmate can be placed in his closed front cell for an indefinite period within the discretion of the H-Unit manager until that manager decides the inmate is "ready" to have his door opened. Unless the unit manager's discretion is in some way limited, the evils enjoined by *Bono* could potentially reappear. Indeed, the H-Unit manager testified that on one occasion, an outer door was closed for several days. In that situation, the prolonged closure in the closed front cell could have serious negative physical and psychological side effects. A breakdown in communication between the inmate and H-Unit manager could leave the inmate helpless to have his door reopened. Moreover, the reconstruction of the cells to include more visual area does nothing to alleviate the harm occasioned by prolonged closure. Defendants put on no evidence that the new windows decreased in any way the potential for harm to the inmate found in *Bono* to accompany prolonged periods in the closed closed-front cell.

Nevertheless, the Court is well aware that the prison officials need some device to prevent certain flagrant violations of prison rules, such as the throwing of food, garbage and human waste out onto the range. Allowing such behavior to occur unchecked would pose health and safety hazards which are obvious to all.

A compromise which satisfies constitutional standards applicable is one in which (a) the discretion of the H-Unit Manager to close an outer door is limited by a written rule providing under what circumstances it will be closed; (b) informs the inmate of the reason for the closing of the outer door and under what conditions it shall be reopened; and (c) some form of review to assure the discretion of the Unit Manager is being properly exercised. Such review could be by a Control Unit Team or IDC or some other competent panel.

■ The Court is well aware that the informed discretion of prison officials is to be given considerable leeway. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, the real possibility of the potential recurrence of the harms enjoined by *Bono* necessitate further safeguards accompanying closure of the outer door of cells 9 through 18 on B Range.

Accordingly, the defendants are ordered, and the plaintiffs permitted, to submit a proposal governing the non-consensual closing of the outer doors of the closed front cells 9 through 18 on B Range in H-Unit. These proposals shall be submitted within

thirty (30) days of the date of this order, and shall be consistent with the scope of this order.

In addition, plaintiffs' Motion for a Rule to Show Cause is hereby DENIED.

The record is devoid of any evidence demonstrating an intent to thwart the Court's order. Rather, considering what appeared to be a bona fide attempt at compliance on behalf of defendants, and the closeness of the question involved, it cannot be said that a citation should issue.

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

This matter is before the Court pursuant to the Court's order of January 16, 1981, and plaintiffs' Motion for Reconsideration and Memorandum in Opposition to Any Order Allowing for Resumption of the Use of Closed-Front Cells at the Marion Penitentiary, filed February 19, 1981.

In the order of January 16, 1981, the Court stated:

[T]he defendants are ordered, and the plaintiffs permitted, to submit a proposal governing the non-consensual closing of the outer doors of the closed front cells 9 through 18 on B Range in H-Unit.

Defendants filed their proposals on February 12, 1981, and plaintiffs filed their Motion for Reconsideration, which apparently contains their proposals, on February 19, 1981. Defendants' proposal is as follows:

The door of a closed front inmate's cell may be closed and secured as the result of conduct by the inmate confined therein which is disruptive and/or threatening to the secure and orderly operation of the Control Unit and the staff or inmates confined therein. Examples of such conduct which would warrant imposition of such control includes, but is not limited to: throwing or ejecting anything out of the cell; threatening or attempting to assault or assaulting another staff or inmate; making or creating loud noises; loud verbal language and expression that potentially disturbs another inmate or seeks to incite other inmates to become disruptive. The Control Unit Manager or in his absence, the Acting Control Unit Manager will have the authority to order the closing and securing of the door. Whenever it becomes necessary to secure an inmate's closed front door, Attachment 5 will be completed, stipulating the following: Why the action was taken; under what conditions the restriction will be rescinded; and thereafter forwarded to the designated Associate Warden for his review with copies subsequently distributed to the respective inmate, the reviewing Associate Warden, and a copy to the closed front status log.

While in closed front status, an (in-person) informally daily review will be conducted by the Control Unit Manager (or in his absence, the Acting Control Unit Manager) by contacting the respective inmate, making a decision on the restriction and recording the action and reasons for the action relative to the restriction on the Record Form 24 (Work Assignment Sheet) of the inmate's official file. In addition, if the inmate remains under this status for seven continuous days, a formal review will be conducted by the Control Unit Team with the respective inmate present, documenting the result of the review on the "Closed Front Status Placement/Review Sheet" (See Attachment 5). In addition to the aforementioned reviews, the inmate may seek further relief via the Administrative Remedy process as set forth in Program Statement (1330.7), Administrative Request for Inmates.

Attached to the proposal is a copy of the "Closed Front Status (Placement/Review Sheet)." The second part of the proposal states that a log shall be kept by the Control Unit Manager which shall contain all closed front status placement and review sheets.

On May 12, 1981, defendants filed a Motion to Supplement Record, attached to which was an Institution Supplement, dated April 16, 1981, governing operation of the Control Unit at U.S.P. Marion. The Supplement incorporated virtually verbatim

and implemented the proposal of defendants regarding "Closed Front Cell Status," filed with this Court on February 12, 1981. The Court hereby GRANTS defendants' motion, and the Institution Supplement is properly before the Court. (See Appendix.)

Plaintiffs strongly protest the proposal submitted by defendants. In their view, there are "no fair procedures in a democratic society for the infliction of the unnecessary pain and suffering which results from the sensory and social deprivation caused by confinement in these cells." Addressing the specific procedures proposed, plaintiffs argue that any written rule allowing for the use of the closed front cells based on the Control Unit Manager's judgment that an inmate poses a threat to the security and safety of the inmate and staff is vague and subjective enough to allow for wholesale abuse of the cells. Moreover, notice to the prisoner and a statement of conditions under which the door will be reopened, argue plaintiffs, suffers from the same open ended language. In short, plaintiffs contend that "Marion prison officials cannot be trusted to close the outside cell doors only when 'necessary.'" Thus, the question before the Court is whether the proposal of defendants satisfies constitutional standards.

This rule to show cause has brought to the forefront a situation which the Court did not foresee in 1978 at the time the original *Bono* order was issued. That unforeseen situation is the emergency which can arise when an inmate housed in a closed front cell on which the outer door cannot be closed by prison officials creates a health and safety hazard to inmates and prison employees by ejecting personal property, prison property, trash and human waste out of the cell onto the range. That this hazard exists is uncontradicted by plaintiffs. Indeed, when this Court toured the Control Unit in November of 1980, the nature of the hazard was graphically clear. The sink and toilet facilities in one cell on B Range had been destroyed and were undergoing repair. In the cell of one inmate on B Range, in one of the cells of 9 through 18, the toilet facilities had been partially destroyed, the cell littered with trash, and the walls of the cell smeared almost entirely with the inmate's own excrement. This presented a dire and frustrating situation; dire because the need for corrective action was real and frustrating since no available remedial measures which would comply with *Bono* seemed to exist.

After a great deal of deliberation and review of the proposals submitted, it is the Court's opinion that the proposal submitted by defendants, with such clarifications as the Court shall make, satisfies the Eighth Amendment. The reasons for this conclusion are set out fully below. However, at this point, it should be made clear that the Court is not relenting either by intent or effect on the holding of the original *Bono* order. Nonconsensual closure of the outer door of the closed front cells remains generally forbidden in the Control Unit, except for emergency situations, notwithstanding the changes made by defendants in the physical construction of the outer walls and doors of the closed front cells. The nonconsensual closure of the outer doors as permitted in this order and as previously sanctioned in the order of January 16, 1981, may only take place on Cells 9 through 18 of B Range. Concomitantly, nonconsensual closure of the outer doors of the closed front cells on A, C, and D Ranges is still expressly forbidden.

The Eighth Amendment prohibition against cruel and unusual punishment cannot be crystallized into a static "test," but, instead, judged in terms of evolving standards of decency that mark the progress of a maturing society. *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). With respect to conditions of confinement in prisons, the United States Supreme Court has recently stated that "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, —— U.S. ——, ——, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). In *Rhodes*, the court held that

double celling in prisons does not violate the Eighth Amendment where there is no other evidence demonstrating that such confinement is cruel and unusual under contemporary standards. The Court noted that the double celling did not lead to deprivations of essential food, medical care or sanitation and did not foment violence or create other intolerable conditions. At ——, 101 S.Ct. at 2399. The Eighth Amendment challenge in the matter before this Court is different from *Rhodes*, and from the usual conditions of confinement case in that it does not concern lack of sanitation, horrendous overcrowding and excessive violence, *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd as modified*, 559 F.2d 283 (5th Cir. 1977), *rev'd in part on other grounds*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Rather, the instant challenge focuses on the physiological and psychological harm accompanying enclosure in the solitary, secured closed front cell.

 Thus, the constitutionality of confinement in closed front cells numbers 9 through 18 on B Range rests upon examination of more subtle, less tangible factors. In this regard, the Court heeds the observations of both the Seventh Circuit Court of Appeals, *Bono v. Saxbe*, 620 F.2d 609 (7th Cir. 1980) and the Supreme Court of the United States, *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) that prison conditions subject to Eighth Amendment challenge must be considered together, in context and in consideration of the cumulative impact upon the inmates. This Court heard extensive testimony and actually toured the Control Unit before enjoining the nonconsensual use of the closed front cells in 1978. As was stated in the Court's order of January 16, 1981, the cruel and unusual aspect of nonconsensual use of the closed front cells prior to April 19, 1978, lay in the fact that the outer door of the cell was kept closed as a general rule for long periods of time and that the inmate often had no idea why his outer door was closed or how to effect its reopen-

ing. An inmate might have been locked in his closed front cell for up to twenty-three and one-half hours a day, for a number of days known only to the caprice of his turnkey. As the Court then noted, this "unnecessary pain and suffering" was never even justified at trial.

In contrast, under the proposal contained at paragraph 6(j) of defendants' Institution Supplement, MI–5212.3a, entitled "Control Unit Programs," dated April 16, 1981, a recorded rationale must be advanced for an initial closing of the outer door, the inmate is given written notice of the reason, and the inmate then receives status checks on a daily basis. First, an inmate's outer door can be closed only for reasons which are related to the security of the Control Unit or the safety of the inmates and staff. Second, when the door is closed, the inmate will be given a copy of a completed "Attachment 5," which states why the action was taken and the conditions under which the door will be reopened. The completed Attachment 5 sheets will be compiled in a log kept by the Control Unit Manager. Third, and of primary importance, the Control Unit Manager will conduct a daily interview with the inmate, make a decision with respect to closed front status, and record the result of and reason for that decision on Record Form 24. Thus, the inmate is given a daily choice either to cease the activity which brought on the closed front status or to continue to cause health and safety hazards which necessitated the closing in the first place. The actual passage of time during which an inmate is placed nonconsensually in a closed front cell is one day. Finally, if an inmate remains in closed front status for seven successive days, a formal review will be conducted by the Control Unit Team, with the inmate present.

The procedures proposed by defendants, when applied to remedy an emergency, undercut plaintiffs' argument that they inflict unnecessary pain and suffering in two respects. First, the pain and suffering incident to closed front status under the proposal is simply not as severe as during the

pre-*Bono* period. The indefinite, prolonged, unjustified and capricious nature of the confinement has been changed totally. Each period of closed front status will be limited to a shorter definable, day long period, at the end of which the inmate can agree to cease his safety and security threatening activity and have his outer door opened. Second, when the outer door is closed, it is closed for an articulable and valid reason necessarily related to the security of the institution and the health of the inmates and staff. Testimony indicated the existence of such a threat when inmates throw things from their cells, such as personal property, food, garbage, urine or feces. Thus, closing the outer door is well calculated to halt this activity or at least to prevent it from posing a health and safety hazard to others.

This Court has presided personally over this entire *Bono* litigation. Having viewed the conditions in the Control Unit prior to and after the modifications made by prison officials pursuant to *Bono*, and considering the cumulative impact of the proposals on the inmates, the Court is of the opinion that the use of the Control Unit closed front cells on B Range, numbers 9 through 18, under the proposals offered by defendants, and used only to remedy an emergency, will not visit inhumane, indecent, uncivilized or unnecessary pain and suffering on the inmates therein.

However, as an adjunct of this opinion and as part of this Court's order, defendants are required to submit to this Court for a period of one (1) year from the date of this order copies of all Attachment 5 forms filled out, and the results of all reviews made by the Control Unit Team of inmates under Closed Front Status for a period of seven (7) days. Since this order is intended not to allow prison officials to circumvent *Bono*, but only to allow them to handle on a short term remedial basis an especially disruptive inmate who creates by his conduct a danger to everyone on the range, a review of the records kept will allow this Court to ascertain whether prison officials are using "Closed Front Status" only for the limited, latter purpose.

As indicated above, plaintiffs have filed a Motion for Reconsideration of the order of January 16, 1981. In light of the result reached above, the Motion for Reconsideration is hereby DENIED. In the same memorandum, plaintiffs have offered objections, which the Court shall address in order.

First, plaintiffs argue that this discretion vested in the Control Unit Manager under the proposals renders his decisions to close the outer doors free from outside scrutiny. This is not so. His actions will be recorded in the log, and the Court, as a condition of its order, requires that copies of all Closed Front Status Reports on Attachment 5 forms made be forwarded to the Court for inspection for a period of one year. While plaintiffs assign to defendants the most diabolical motives, there was no evidence introduced at the hearing which would lead the Court to believe that false or misleading entries will be made. The only apparent danger is that vague and unspecific entries will be made. However, the Court will be in a position to review those entries and call for more specific information, if required.

Second, plaintiffs argue that so-called procedural safeguards provide no protection since they are continuously ignored by the administration at Marion in other contexts in the Control Unit. As to this contention, the Court notes that it is a mere allegation unsupported by any evidence adduced at the hearing on November 3 and 4, 1980. To underscore this allegation of neglect, the plaintiffs, in a footnote, characterize the Court as coalescing in this delay by refusing to address "many urgent matters . . . raised on remand in this case in November of 1980" that have "still not been ruled on or even addressed by this Court." For the record, plaintiffs' Motion for Additional Relief on Remand was considered and ruled on in the order of December 24, 1980.

Third, plaintiffs assert that defendants failed to show any need which outweighed the harm inflicted. With this conclusion, the Court simply disagrees. Defendants demonstrated a dire need to put a stop to certain kinds of behavior which disrupted

the Control Unit and threatened the health and safety of inmates and staff. And the Court has determined that the conditions resulting from the closing of the outer door in an emergency situation, under the proposals advanced, will not inflict cruel and unusual punishment.

Finally, plaintiffs offer a plea that this Court take the "first step" in improving the penology at the U.S.P. Marion by eliminating the power of the prison administration to take actions, that is, closing the outer door of the closed front cells, which incite the reactive and negative behavior which, in turn, the prison officials use to justify the use of the closed front cells. If the Court could choose among a range of potential solutions according to which seemed like the best way to operate the Control Unit, the solution suggested by plaintiffs could well be the one chosen. However, "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. *Rummel v. Estelle*, 445 U.S. 263, 275, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980). The role of the Eighth Amendment is not one which allows federal courts unbridled choices. Rather, it restrains the use of power by the Federal Government to accomplish otherwise legitimate ends in a manner consistent with the Constitution. Here, the Court is called upon only to decide whether the means used satisfy the Eighth Amendment. The Court has decided that they do.

In sum, (1) defendants' Motion to Supplement Record is hereby GRANTED; (2) plaintiffs' Motion for Reconsideration is hereby DENIED: (3) the proposals submitted by defendants pursuant to this Court's order of January 16, 1981, and now embodied in the Institution Supplement satisfy the Eighth Amendment to the Constitution of the United States; and (4) the Court's ruling as to the constitutionality of the proposal is contingent upon the defendants filing with the Court at East St. Louis, Illinois, on a weekly basis for a period of one (1) year, copies of all Attachment 5 Closed Front Status Reports.

IT IS SO ORDERED.

APPENDIX A

EXHIBIT 5

EXHIBIT 1

EXHIBIT 8

Federal Prison System

*U. S. Penitentiary*

Marion, Ill. 62959

Number: MI–5212.3a

Date : 4/16/81

Subject : CONTROL UNIT PROGRAMS

# Institution Supplement

1. PURPOSE. The purpose of this Institution Supplement is to provide local guidance for implementation of the Federal Prison System Program Statement on Control Unit Programs.

2. DIRECTIVES AFFECTED. Federal Prison System Program Statement 5212.3, dated 7/16/79, Control Unit Programs, is referenced. Marion Institution Supplement MI–5212.3, dated 4/17/80, is superseded.

3. ADMISSION TO THE CONTROL UNIT.

 a. *Classification.* Upon admission to the unit, an inmate will ordinarily be classified within 10 days. When initially classified by the Unit Team, the inmate is advised of his expected duration of confinement (status) in the unit. The nature of the act(s) which resulted in an inmate's placement in the control unit will be the primary factor in determining the number of months to be served in the unit. Status assignments may range from one month to any definite number of months. The inmate's status may be increased or decreased by the unit team dependent upon his behavior within the unit. At initial classification, the inmate is given the following: Control Unit Classification Summary (See Attachment 1) which states the reason for placement in the unit and the assigned status; BP–6.1 Program Plan, and Control Unit Orientation Booklet. In addition, the activities of the unit are explained to the inmate and the criteria for release is discussed.

 b. *Personal Property.* Personal property is limited to those articles provided for in the local Institution Supplement MI–5580.1A, entitled "Inmate Personal Property—Control Unit", dated April 1, 1981. Nothing made of glass or metal will be issued.

 c. *Cell Assignment.* Cell assignments are made by the unit manager or his designee. In most cases, new commitments will be initially assigned to a cell on B Range, taking into account space availability. Ordinarily assignment to this range is temporary.

## 4. REVIEW OF CONTROL UNIT PLACEMENT.

a. *Unit Team.* The Unit Team is comprised of the Unit Manager, Case Manager, Correctional Counselor, and Education Representative. This panel reviews each case every 30 days and considers the inmate's unit status, adjustment and readiness for release from the unit. A Control Unit Review Form is completed for each review outlining the inmate's progress and remaining months to be served in the unit. This is signed by each member of the Unit Team with the Warden serving as the reviewing authority. The inmate is given a copy of each Control Unit Review Form (see Attachment 2). It is mandatory that an inmate appear for his 30 day review in order to receive monthly credit.

b. *Executive Panel.* The Executive Panel is composed of the Regional Director, North Central Regional Office, and the Assistant Director, Correctional Program Division. This panel reviews each case every 60 to 90 days to determine the inmate's readiness for release from the unit.

## 5. RELEASE FROM THE CONTROL UNIT.

Either the Unit Team, with approval from the Warden, or the Executive Review Panel may release an inmate from the Control Unit. The Executive Review Panel is normally the releasing body. The following factors are considered in evaluation of an inmate's readiness for release from the unit.

a. Personal grooming and cleanliness.

b. Quarters sanitation.

c. Relationship with other inmates and staff.

d. Work involvement.

e. Self-improvement activities.

f. Adherence to Bureau and Institution Policy.

Prior to each Executive Review, the Unit Team will prepare an Executive Review Sheet (see Attachment 3) and a list of recommended releases (which is subject to approval of the Warden). The Unit Case Manager will prepare an up-to-date progress report and BP–15 on each inmate recommended for release. All material is made available to the Executive Panel as they review each case. The Executive Panel will make the final decision on those recommended for release from the unit. Prior to actual release, this panel will designate a suitable institution for each respective releasee, taking into account the need for security/supervision, inmate programmatic needs and proximity to residence.

## 6. PROGRAMS AND SERVICES.

a. *Education.* An education representative is assigned to the unit to assist inmates in their academic/vocational endeavors and hobby craft. Inmates may earn their GED and/or take correspondence courses, i.e. (college level) while in the unit. Certain hobby craft materials are permitted in the control unit. They are limited to those that do not pose a threat to the security of the institution or safety of staff and inmates subject to the final approval of the education representative and the Control Unit Manager. The respective inmate is responsible for assuming the financial obligations of such projects.

b. *Work Assignment.* The performance pay in the control unit supports six positions, i.e., A-Range Orderly, B-Range Orderly, C-Range Orderly, D-Range Orderly, and two (2) barbers. Inmates may be assigned other duties as deemed appropriate by the unit staff.

c. *Industries (UNICOR).* C-Range in the control unit has been designated as the industry range. In order to be considered for placement in this program, an inmate must submit a written request to the Unit Manager. Inmates who have demonstrated that they can assume additional responsibility and who are within six (6) months of release, will be given preference in obtaining this assignment.

Inmates on the industry range are required to wear safety shoes. Violations of UNICOR regulations may result in reduction in pay, position, or removal from this program. Orderlies on industry range are paid by UNICOR. The feasibility of an industrial program will be dependent on available UNICOR contracts that require a product which is not counterproductive to the operation/security of the unit, availability of a stable work force of sufficient size, and flexibility so far as cell assignments to maintain necessary separation, etc.

d. *Legal.* The control unit is equipped with a legal library and a typing room. Material for these areas is supplied by the education department through the education representative assigned to the unit. This staff member also assists inmates in obtaining legal material from other sources. The typing room is equipped with a typewriter, paper, carbon, etc. To use either service, the inmate must submit a request to the Officer-in-Charge. The inmate's name is placed on a waiting list for the particular room requested. Time in each is allotted in four (4) hour increments. After using the four hours, the inmate may request another four hours when his turn revolves. If an inmate receives an unexpected verifiable deadline, he may request emergency time in the law library or typing room through his case manager. Inmates who utilize these areas for other than the intended purpose, i.e., visiting, will be removed from these areas immediately.

e. *Recreation.* Each inmate is provided a *minimum of seven (7) hours of recreation per week.* Equipment is provided by the education department through the education representative assigned to the unit.

When practical, inmates will be permitted to recreate in groups subject to the approval of the Unit Manager. The following is a breakdown of recreation groups by ranges:

*A-Range.* A maximum of two (2) men per recreation group for inside/outside recreation. The orderly is not permitted out with any other group other than the group to which he is assigned.

*B-Range.* A maximum of two (2) men per inside/outside recreation group. The orderly is not permitted out with any other group other than the group to which he is assigned.

*C & D Ranges.* Maximum of two (2) men per group for inside/outside recreation. The orderly is not permitted out with any other group other than the group to which he is assigned.

*Disciplinary Segregation.* Inmates who are placed in D/S will recreate in single status unless otherwise authorized by the Control Unit Manager. Further, inmates in D/S status will be limited to 1 hour of inside recreation daily.

The maximum number of inmates that may comprise any outside recreation group may not exceed two (2). Outside recreation will be accomplished on a rotational basis (i.e., A-Range, B-Range, C-Range and D-Range). Inmates who live on the same range and wish to recreate together must submit a request signed by each man. The OIC will verify each signature and give the request to the Unit Manager for final review and approval. A recreation log is kept on each inmate with the beginning and ending time of each recreation period noted. If an inmate refuses to recreate, this is also noted and is counted toward his weekly recreation time. With the exception of Disciplinary Segregation, all other cells are equipped with a television.

f. *Medical Services.* A Physician's Assistant visits the control unit daily to respond to medical complaints and coordinate appointments, if necessary, with the doctor. The P.A. will tour the unit (each range) no less than three (3) times per day.

g. *Visiting.* Upon arrival, an inmate is requested to submit a list of prospec-

tive visitors to the Case Manager. After a list has been approved, the inmate may receive visits in the Controlled Visiting Area from 8:00 A.M. to 3:30 P.M. on Thursdays, Fridays, Saturdays, Sundays and holidays. Prior to exiting the control unit for a visit, each inmate will undergo a visual body search. In addition, each inmate will wear a khaki shirt, pants and institution or personal dress shoes. Likewise, prior to reentering the unit, the respective inmates will undergo a second body search.

h. *Commissary.* Inmates in the control unit are permitted to purchase commissary once per week. Commissary slips are distributed to the inmates during the weekend and must be turned in to the commissary by 11:00 A.M., Monday of each week. Commissary items are delivered to the unit on Tuesdays by the commissary staff. Commissary Management Manual 4500.INS, Chapter 15915C limits the amount an inmate may spend in the commissary to $85.00 per month. No glass or metal containers are permitted. Inmates confined in Disciplinary Segregation are limited to a purchase of postage stamps only, the maximum amount of $10.00.

i. *Disciplinary Segregation.* Disciplinary Segregation in the control unit is designated as cells 9 through 18 on B Range. Personal property in this area is limited to those items set forth in Marion Institution Supplement MI–5270.3A (see Attachment 2, dated 3/12/81). Disciplinary Segregation in the control unit is controlled by the Institution Discipline Committee. The outer door of each cell is locked during movement of an inmate within the area. These doors are unlocked when movement is completed. Should an inmate become disruptive while in Disciplinary Segregation, the outer door may be locked for a period of time, however, only upon authorization of the Control Unit Manager or Chief Correctional Supervisor subject to review by the Associate Warden (Programs).

j. *Closed Front Cell Status.* The door of an inmate's closed front cell may be closed and secured as the result of conduct by the inmate confined therein which is disruptive and/or threatening to the secure and orderly operation of the control unit and the staff or inmates confined therein. Examples of such conduct which would warrant imposition of such control includes, but is not limited to: throwing or ejecting anything out of the cell; threatening or attempting to assault or assaulting another staff or inmates; making or creating loud noises; loud verbal language and expression that potentially disturbs another inmate or seeks to incite other inmates to become disruptive. The Control Unit Manager or in his absence, the Acting Control Unit Manager will have the authority to order the closing and securing of the door.

When it becomes necessary to secure an inmate's closed front door, Attachment 5 will be completed, stipulating the following: Why the action was taken; under what conditions the restriction will be rescinded; and thereafter forwarded to the designated Associate Warden for his review with copies subsequently distributed to the respective inmate, the reviewing Associate Warden, and a copy to the closed front status log, which will be maintained by the Control Unit Manager.

While in closed front status, an (in-person) informal daily review will be conducted by the Control Unit Manager (or in his absence the Acting Control Unit Manager) by contacting the respective inmate, making a decision on the restriction, and recording the action and reasons for the action relative to the restriction on the Record Form 24 (Work Assignment Sheet) of the inmate's central file. In addition, if the inmate remains under this sta-

tus for seven (7) continuous days, a formal review will be conducted by the Control Unit Team with the respective inmate present, documenting the results of the review on the "Closed Front Status Placement/Review Sheet" (see Attachment 5). In addition to the aforementioned reviews, the inmate may seek further relief via the Administrative Remedy process as set forth in Program Statement 1330.7, Administrative Request for Inmates.

k. *Telephone Calls.* Each inmate is permitted two (2) social calls per month. These calls are scheduled and completed by the correctional counselor. The counselor also approves emergency calls. Legal calls must be approved by the Case Manager only. Further, legal phone calls will be authorized only to attorneys under the stipulation set forth in Institution Supplement MI–5264.2, Telephone Regulations for Inmates.

l. *Mental Health Services.* The Chief Psychologist sits at Unit Team meetings in an advisory capacity. During the inmate's first 30 day period in the control unit, a psychological evaluation is prepared. Additional evaluations on each inmate are prepared no less than quarterly. A consulting psychiatrist is available when referral is made by the medical department. Inmates who desire to speak to the psychologist may submit their requests directly to him or via unit staff.

m. *Progress Evaluation.* Prior to each 30 day review the correctional counselor assigned to the unit assures that a Progress Evaluation Form (see Attachment 4) is completed on each case. This form provides an evaluation of the inmate's progress by the OIC of each shift, correctional counselor and industry foreman.

7. EFFECTIVE DATE. This Institution Supplement is effective April 30, 1981.

/s/ H. G. Miller

H. G. Miller
Warden

CONTROL UNIT PROGRAMS
ATTACHMENT 1
UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL PRISON SYSTEM

_____
Date

CONTROL UNIT CLASSIFICATION SUMMARY

SENDING INSTITUTION _____

Name: _____ Institution: _____ D.O.B.: _____
Reg. No.: _____ Date: _____ Age: _____

REASON FOR CONTROL UNIT PLACEMENT:

STATUS ASSIGNED: NUMBER OF MONTHS _____

Your assigned status may be increased or decreased as the situation warrants, depending upon your satisfactory or unsatisfactory adjustment within the Unit setting.

FACTORS CONSIDERING FOR RELEASE:

1. Quarters Sanitation
2. Personal Grooming and Cleanliness
3. Relationship with other Inmates & Staff
4. Work Involvement

5. Self-improvement Activities
6. Adherence to Bureau & Institution Policy

CONTROL UNIT COMMITTEE Received Copy
 _____
 Inmate Signature Date

CONTROL UNIT PROGRAMS
ATTACHMENT 2
UNITED STATES PENITENTIARY
MARION, ILLINOIS
C O N T R O L U N I T R E V I E W

Committed Name _____ Reg. No. _____ Date _____

Date classified to Control Unit: _____

REASON FOR REVIEW: _____ Initial Review _____ 30-day Review _____ Special Review

ADJUSTMENT SINCE LAST REVIEW: (Which was held _____ )

_____ Good _____ Marginal _____ Poor

RELEASE READINESS FACTORS:

Quarters Sanitation _____
Personal Grooming & Cleanliness _____
Personal relationship with other inmates & staff _____
Work Involvement _____
Self-improvement Activities _____
Adherence to Bureau & Institution Policy _____
Additional Comments _____

COMMITTEE RECOMMENDATION: (Date of next review _____·_____ )

_____ Credit with one month of satisfactory conduct.
_____ Do not credit with one month of satisfactory conduct.
_____ Do not credit with one month of satisfactory conduct and extend projected release date
 _____ months.

COMMITTEE: _____ _____ _____ _____
 Chairman Member Member Member

REVIEWER: _____
 AW(P)

STATUS _____ No. months to projected release _____

 NOTED: _____
 Warden

cc:
 Central File through Casemanager, Team H

MI–5212.3A

CONTROL UNIT PROGRAMS
ATTACHMENT 3
EXECUTIVE COMMITTEE REVIEW SHEET REVIEW DATE
 _____

| NAME | NUMBER | SENTENCE | AGE | # PRIOR COMMITMENTS (H–UNIT) |
|------|--------|----------|-----|------------------------------|
| | | | | |

STATUS CURRENT DATE COMMITTED COMMITTING
ASSIGNED STATUS CMC TO H–UNIT INSTITUTION

_____ _____ _____ _____ _____

REASON FOR CONTROL UNIT PLACEMENT: _____

_____

_____

_____

TEAM COMMENTS: _____

_____

_____

TEAM RECOMMENDATION: _____

_____

_____

INMATE COMMENTS TO COMMITTEE: _____

_____

_____

_____

EXECUTIVE COMMITTEE ACTION: _____

_____

_____

_____ _____
ASSISTANT DIRECTOR, FPS REGIONAL DIRECTOR, NCRO

CONTROL UNIT PROGRAMS
ATTACHMENT 4
PROGRESS EVALUATION

Return to: _____ Unit: _____

Inmate's Name: _____ Reg. No. _____ Unit: _____ Detail: _____

Purpose of Evaluation: _____

Detail Foreman's Comments and Evaluation:

Inmate duties: _____
Attitude: _____
Skill level: _____
Interest: _____
Supervision required: _____
Performance level: _____
Recommendations and/or comments: _____

_____

_____

 Detail Foreman's Signature _____
Quarters Officer's Comments and Evaluation: Morning Watch

Length of time observed in Unit: _____
Conduct: _____
Response to supervision: _____
Interpersonal relations (staff & inmates): _____

_____

Recommendations and/or comments: _____

_____

_____

 Officer's Signature _____
Quarters Officer's Comments and Evaluation: Day Watch

Length of time observed in Unit: _____
Conduct: _____
Response to supervision: _____
Interpersonal relations (staff & inmates): _____

_____

Leisure time activities: _____
Sanitation Level: _____
Recommendation and/or comments: _____

_____
_____

Officer's Signature _____

Quarters Officer's Comments and Evaluation: Evening Watch

Length of time observed in Unit: _____
Conduct: _____
Response to supervision: _____
Interpersonal relations (staff & inmates): _____

_____
Leisure time activities: _____
Recommendations and/or comments: _____

_____
_____

Officer's Signature _____

Correctional Counselor's Comments, Evaluation, and Summary:

Length of time observed on caseload: _____
Conduct: _____
Response to supervision: _____
Interpersonal relations (staff & inmates): _____

_____
Leisure time activities: _____
Program participation: _____

_____
_____

Comments: _____

_____
_____
_____

Recommendations: _____

_____
_____
_____

Summary: _____

_____
_____
_____

Correctional Counselor's
Signature _____

CONTROL UNIT PROGRAMS
ATTACHMENT 5
CLOSED FRONT STATUS
(PLACEMENT/REVIEW SHEET)

Inmate Name: _____ Reg. No. _____ Date: _____
You have been placed on closed front status (outer door secure) because you _____

_____
_____

Your closed front door will remain secured until you regain control of your otherwise negative behavior that disrupted/threatened the orderly functions of the Unit and/or threatened the health and welfare of staff and other inmates. Your status will be reviewed informally (daily) by the **Control Unit Manager** (in-person interview), and reviewed formally (every 7-days) by the Control Unit Team (in-person interview) as long as you remain in this status. You also have the option of appealing this action by means of the "Administrative Remedy Request for Inmates".

**1206**

7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____
7-day Review Date: _____ Action: _____ Reason: _____

Action Taken By: _____
L. W. Graves, Control Unit Manager

Reviewed By: _____
Associate Warden

cc: Inmate; AW; Closed Front Status Log